UNITED STATES DISTRICT COURT
DISTRICT COURT OF MASSACHUSETTS

CIVIL ACTION NO. 11-10558-GAO

CAPTAIN JAMES BRUCE HOCKING
Plaintiff,

v.

LANCER INSURANCE COMPANY
Defendant.

OPINION AND ORDER
March 29, 2013

O'TOOLE, D.J.

## I.   Introduction

This case arises out the defendant's denial of insurance coverage. The plaintiff, James Hocking, was the captain of the M/V Nantucket, a Massachusetts Steamship Authority vessel that transports passengers between Cape Cod, Nantucket, and Martha's Vineyard. He requested that Lancer pay his costs of defending an administrative action by the Coast Guard to revoke his Merchant Marine Officer's License. After the license was revoked, the plaintiff also filed a claim for lost income under the same insuring instrument. Lancer denied coverage for both claims. The parties have filed cross motions for summary judgment.

## II.   Standard of Review

Summary judgment is appropriate "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing the basis for its motion and identifying where there exists a lack of any genuine issue of

material fact. Id. at 323. A dispute is "genuine" only if a reasonable jury could find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the Court must "view the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III. Background

The plaintiff filed a nine count Complaint against Lancer seeking damages under two provisions of a certificate of insurance issued by Lancer. He claims that Lancer breached its obligation under the insurance certificate by not paying for his defense in a suspension/revocation action initiated by the Coast Guard and by denying his claim for lost income after his license was revoked. In the alternative, the plaintiff claims Lancer should be estopped from denying coverage based on the course of dealing between the parties.

### A. License Dispute

The facts surrounding the Coast Guard's action with regard to the plaintiff's license are undisputed. The plaintiff worked for the Steamship Authority since 1973, transporting passengers from Cape Cod to Nantucket and Martha's Vineyard. From 1985 through January 1, 2011, he held a Merchant Marine License issued by the United States Coast Guard. Since 1995 he had been sailing with an implanted cardiac defibrillator ("ICD") but received annually a medical waiver that allowed him to continue sailing. In 2008, however, the Coast Guard issued new guidance for evaluating the physical conditions of applicants for merchant marine licenses, and under the new policy a mariner with an ICD is generally not eligible for a medical waiver.

In April 2009 the plaintiff received a letter from the Coast Guard declaring him unfit for duty because of his ICD. The letter directed him to contact the Coast Guard to discuss options

regarding the disposition of his license. On April 25, 2009, the plaintiff requested that the Coast Guard reconsider its decision. On June 12, 2009, the Coast Guard informed him in writing that it had denied his request for reconsideration and reaffirmed its decision.

On September 10, 2009, the plaintiff received a letter from the Coast Guard's Suspension and Revocation National Center of Expertise. The letter informed him that the National Maritime Center ("NMC") determined that he was physically incompetent to perform the duties required under his license. The letter gave him five options: appeal the decision, apply for a document of continuity, voluntarily deposit his license, voluntarily surrender his license, or take no action in which case the Coast Guard would initiate suspension and revocation proceedings by issuing a complaint for incompetence. In October 2009 the plaintiff chose the first option and appealed the reconsideration decision.

In a letter dated February 15, 2010, the Coast Guard informed the plaintiff that it had upheld the NMC's decision. The letter stated that this constituted a final agency action and that the plaintiff must choose one of the options from the September 10, 2009 letter and either apply for a document of continuity, voluntarily deposit the license, or voluntarily surrender the license. The plaintiff did not exercise any of those options and on March 23, 2010, the Coast Guard filed a complaint for incompetence against him for operating a vessel while medically unfit for duty. Ultimately his license was revoked.

    B.    <u>Communications between the Plaintiff and the Defendant</u>

There is also no material difference in the parties' accounts of the communications between the plaintiff and Lancer.

Following the receipt of the initial letter declaring him unfit for duty on April 2, 2009, the plaintiff called Lancer and spoke to a representative. That person told him that the Coast Guard's

letter was not covered under the terms of the insurance agreement. However, he was advised to get in touch with William Hewig, Lancer's National License Insurance Legal Coordinator. The plaintiff had a discussion with Attorney Hewig and consulted with others but did not retain an attorney to represent him for most of the process detailed above. It was only after receiving the letter on February 15, 2010, that the plaintiff retained an attorney to represent him.

The next interaction between the plaintiff and Lancer occurred after the Coast Guard initiated the enforcement action in late March 2010. On April 2, 2010, the plaintiff contacted administrator Ann Ryan at Lancer by telephone regarding the Coast Guard's complaint for incompetence. On the same day he sent Ms. Ryan an email requesting coverage and also faxed a copy of the Coast Guard's complaint. On April 5 the plaintiff again contacted Ms. Ryan via email. In response Ms. Ryan wrote back that she was passing the information along to Attorney Hewig and said she would ask Hewig to request all the relevant paperwork from the plaintiff's retained attorney. Ms. Ryan also wrote, "We have never encountered this situation before, but will do our best to resolve it." (Def.'s Statement of Material Facts, Ex. 2 at 32 (dkt. no. 21-2).)

Between April 5 and May 13, 2010, there was no further communication between the plaintiff and Lancer. Between those dates Attorney Hewig represented the plaintiff. On May 13, 2010, Lancer sent a letter to the plaintiff denying coverage under the policy for the enforcement action. After receiving the letter, the plaintiff continued to utilize the services of Attorney Hewig at the plaintiff's own expense. Following the revocation of the plaintiff's license he contacted Lancer regarding his loss of income claim. Lancer also denied coverage of that claim.

## III. Discussion

The plaintiff claims that Lancer improperly denied coverage under two sections of the insurance agreement. Specifically, the plaintiff claims that Lancer was obligated to pay for his

defense of the Coast Guard's license action and that Lancer is obligated to pay lost wages resulting from the license revocation.

  A.  <u>License Defense Coverage</u>

Under the insurance agreement Lancer is obligated to pay to defend against actions taken to revoke or suspend an insured's license in certain circumstances. The language of the agreement reads,

> If the vessel to which the CERTIFICATEHOLDER is officially assigned is involved in a SHIPPING CASULTY or SHIPPING INCIDENT, as they are defined herein, which results in an investigation, inquiry, hearing, administrative proceeding, trial or other action, by or before the United States or Canadian Coast Guard, National Transportation Safety Board, any state pilotage authority or any other authority in the United States or Canada with jurisdiction to recommend or cause the CERTIFICATEHOLDER's Marine License(s), as defined herein and as stated in the Declarations (hereinafter called "stated license"), to be revoked, suspended or reduced in grade (hereinafter called a "LICENSE ACTION"), the Company shall pay on behalf of the CERTIFICATEHOLDER all reasonable attorneys' fees and expenses (including taxable court costs and expenses) as defined herein and actually incurred in the defense of any LICENSE ACTION.

(Def.'s Statement of Material Facts, Ex. 1 at 3 (dkt. no. 21-1).)

There is no dispute that the plaintiff is a certificateholder under the Lancer policy. The dispute is whether the Coast Guard's complaint for incompetence against the plaintiff is a "shipping incident" as defined in the certificate.[1] The certificate agreement defines a "shipping incident" as,

> An unexpected event, accident or happening other than a SHIPPING CASUALTY occurring in the course of or arising out of the performance of the CERTIFICATEHOLDER'S lawful duties or responsibilities within and under the legal scope and authority of the CERTIFICATEHOLDER'S stated license and in

---

[1] The plaintiff concedes that the Coast Guard's action does not constitute a shipping casualty which is defined as "[a]n accidental stranding, sinking, fire or explosion, collision, allusion, oil spill, grounding of the vessel, heavy weather damage or wake damage sustained to or caused by the vessel or loss of life or personal injury occurring on board or caused by the vessel, but only if such shipping casualty resulted from the alleged negligence or unintentional conduct of the CERTIFICATEHOLDER." (Def.'s Statement of Material Facts, Ex. 1 at 6 (dkt. no. 21-1).)

5

>the ordinary course of employment aboard the vessel to which the CERTFICATEHOLDER is officially assigned which results in an action taken against the CERTIFICATEHOLDER'S marine license.

(Id.)

The interpretation of an insurance contract is a matter of law, and like all contracts, insurance contracts are to be construed according to their fair and reasonable meaning. Cody v. Conn. Gen. Life Ins. Co., 439 N.E.2d 234, 237 (Mass. 1982). "A policy of insurance whose provisions are plainly and definitely expressed in appropriate language must be enforced in accordance with its terms. But, if the contract is ambiguous, doubts as to the meaning of the words must be resolved against the insurance company that employed them and in favor of the insured" Id. (internal quotations and citations omitted).

As is often the case, broad general language in insurance agreements can create uncertainty about whether particular real-world events fall within the scope of coverage. That uncertainty can become ambiguity when the language is too broad or general to permit confident judgment about whether coverage exists in on a concrete set of facts. There is no ambiguity here. As the second word in the definition of "shipping incident" makes plain, a shipping incident must be "unexpected." The Coast Guard's complaint for incompetence was anything but unexpected.[2] The plaintiff was expressly warned by the Coast Guard both in September 2009 and again in February 2010 that it intended to move to revoke or suspend his license if his medical waiver appeals were denied. The complaint for incompetence does not qualify as an unexpected event, accident, or happening. Under the plain language of the certificate Lancer was not obligated to pay for the plaintiff's defense in the license action.

---

[2] At oral argument, the plaintiff's counsel acknowledged that the "unexpected happening" the plaintiff was relying on to bring the claim within the coverage was the initiation of the Coast Guard enforcement action.

The plaintiff argues alternatively that Lancer should be estopped from denying coverage because of its course of conduct in leading him to think it was covering the claim by having Hewig represent him for six weeks on Lancer's dime. "Estoppel in the insurance context necessarily implies some reasonable, good-faith reliance by the insured upon some act, conduct or inaction of the insurer, to the detriment of the insured. . . . As a general matter, estoppel, like waiver, does not extend, broaden or enlarge coverage so as to include risks not covered within the terms of the policy." Alan Corp. v. Int'l Surplus Lines Ins. Co., 22 F.3d 339, 343 (1st Cir. 1994). Based on its conduct, an insurance company can be estopped from denying coverage based on requirements in the agreement, such as promptly reporting claims, but it cannot expand coverage to encompass risks not set forth in the agreements. See MacArthur v. O'Connor Corp., 635 F. Supp. 2d 112, 120 (D.R.I. 2009) ("[C]overage under the policy does not exist as a matter of law, [therefore] the doctrine of estoppel cannot create coverage where none exists."); Providence Washington Indem. Co. v. Varella, 112 F. Supp. 732, 734 (D. Mass. 1953) (waiver doctrine did not apply because broadening policy's coverage "so as to make it cover a risk not within its terms [is] not a mere waiver of the conditions of the policy but the making of a new contract.").

Moreover, it is ironic that the plaintiff seeks to use Lancer's providing Hewig to represent him against it. What Lancer did was provisionally assume defense costs while it considered whether there was a duty to defend under the certificate. That is entirely proper. See Merrimack Mut. Fire Ins. Co. v. Nonaka, 606 N.E.2d 904, 907 (Mass. 1993) (no waiver found where insurer defended action for five months while determining coverage).

B.   Loss of Income Coverage

The plaintiff also claims that that the defendant breached the insurance agreement by denying the plaintiff's claim for loss of income benefits. Under the terms of the agreement,

> If the CERTIFICATEHOLDER'S stated license is suspended or revoked after a LICENSE ACTION defended under Insuring Agreement II hereof, resulting in an actual loss of wages or salary to the CERTIFICATEHOLDER, the Company agrees, subject to receipt of a proof of loss satisfactory to the Company, to indemnify the CERTIFICATEHOLDER for actual lost insured wages or gross salary as requested in the CERTIFICATEHOLDER'S application for coverage commencing from the effective date of such suspension or revocation, as defined herein, calculated and payable at a monthly rate (or pro rata portion thereof if less than a month) based upon actual average gross monthly wages earned during the CERTIFICATE PERIOD, or insured amount as requested by the CERTIFICATEHOLDER in his/her application for coverage as defined herein, but in no event to exceed the amount stated in the Loss of Income Coverage Declaration on this CERTIFICATE, plus an allowance per day for subsistence, as stated in the Subsistence Allowance Coverage Declaration on this CERTIFICATE. It is expressly agreed that in the event of said suspension or revocation of the CERTIFICATEHOLDER'S stated license, the total number of monthly payments shall not exceed twelve (12) nor continue beyond the effective date on which the CERTIFICATEHOLDER'S license is reinstated, whichever may first occur.

(Def.'s Statement of Material Facts, Ex. 1 at 3 (dkt. no. 21-1).) The plaintiff's claim is that because Lancer provided Attorney Hewig's services at its own cost for six weeks that Lancer should be regarded as having defended the license action so as to trigger the loss of income provision.

This claim also requires the interpretation of the insurance agreement and, as previously noted, is a matter of law for the Court. The plaintiff's argument is at odds with both the language and the spirit of the agreement. For the loss of income provision to apply, the defense of the "LICENSE ACTION" must fall under "Insuring Agreement II," which is the license defense coverage provision discussed above. Lancer correctly determined that the Coast Guard action was not covered under Insuring Agreement II and therefore had no obligation to pay for the

plaintiff's representation under that part. For that reason the loss of income coverage provision is also not invoked.

## IV. Conclusion

For the reasons stated herein, the defendant is entitled to summary judgment as a matter of law on all counts. Therefore, the defendant's Motion for Summary Judgment (dkt. no. 19) is GRANTED, and the plaintiff's Motion for Summary Judgment (dkt. no. 22) is DENIED. Judgment shall enter for the defendant.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge